UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                                    Chapter 11

ARTISANAL 2015, LLC,                                                       Case No. 17-12319 (JLG)

                                       Debtor.
---------------------------------------------------------------x
ARTISANAL 2015, LLC,                                                       Adv. Pro. No. 17-_____

                                       Plaintiff,

   against

387 Park South L.L.C.,

                                       Defendant.
---------------------------------------------------------------x

## ADVERSARY COMPLAINT FOR
## DECLARATORY JUDGMENT AND RELATED RELIEF

      The plaintiff-debtor, Artisanal 2015, LLC (the "Debtor"), as and for its Complaint against the defendant, 387 Park South L.L.C. (the "Landlord"), alleges as follows:

### PRELIMINARY STATEMENT

      1.      The entire Chapter 11 case revolves around the fundamental question as to whether the Debtor's highly valuable lease with the Landlord (the "Lease"), for restaurant premises located at 387 Park Avenue South, New York, NY (the "Premises"), was validly terminated by the Landlord, pre-petition, under a purported Notice of Termination, dated August 14, 2017, relating to the Debtor's alleged failure to renew insurance coverage in accordance with the Lease.

      2.      The Debtor disputes the validity of the Landlord's purported termination of the Lease on at least two grounds. First, the underlying insurance default was timely remedied

within the cure period by the Debtor's procurement of the required liability insurance retroactively to December 9, 2016, without any lapse in coverage.[1]

3. Secondly, the Landlord was stayed from terminating the Lease in August 2017 (when the notice of termination was issued) by virtue of a prior TRO and *Yellowstone* injunction issued on February 8, 2017 ("First *Yellowstone* Injunction"). While the First *Yellowstone* Injunction was issued in connection with an earlier rent dispute, it was broadly worded to create a bar to all future efforts to terminate the Lease by "enjoining and restraining" the Landlord "from taking any action to terminate the lease between the parties" without limitation. A copy of this TRO and ensuing First *Yellowstone* Injunction is annexed hereto as Exhibit "A".

4. Although the Landlord sought to terminate the First *Yellowstone* Injunction just prior to the instant Chapter 11 filing, the State Court never reached the issue. Accordingly, the First *Yellowstone* Injunction governed the rights of the parties. In denying the Debtor's request for a second *Yellowstone* injunction, the State Court referenced the existence of the First *Yellowstone* Injunction as still being in effect. (8/9/17 Tr. p. 44, Line 25 - p. 45, Line 2) The Court stated: "You (Debtor) could run to the Appellate Division, although I don't understand since there is a stay on the other Yellowstone."

5. Yet, given the parties' conflicting positions over termination, this Adversary Proceeding is designed to bring clarity to the Debtor's rights under the Lease going forward in the face of multiple attacks by the Landlord to trigger a forfeiture.

---

[1] There has never been an actual State Court ruling, on the merits, that the Debtor was guilty of an uncured insurance default, justifying termination and forfeiture of the Lease. Instead, the multiple lawsuits referenced herein focused on whether the Debtor's time to cure the default should be extended and tolled under the so-called "*Yellowstone* Injunction" doctrine without reaching the actual validity of the underlying default notice.

{00887990.DOC;3}    2

6.    Indeed, the lead-up to the instant Chapter 11 case presents a classic example of an overbearing and avaricious landlord attempting to exert hegemony over a struggling tenant in a calculated effort to recapture a valuable leasehold.

7.    In reality, however, the Landlord's campaign is punctuated by misrepresentations concerning the legal status of the Premises, which have caused significant delays in the Debtor's efforts to complete construction and open the restaurant.

### The Landlord's Own Misconduct

8.    The Premises were represented by the Landlord, graphically via a diagram attached to the Lease, to include the lobby entrance plus two separate entrance doors leading in and out of the restaurant from Park Avenue South. A copy of the Lease with the diagram of the Premises reflecting the two entrance doors is attached hereto as Exhibit "B".

9.    However, when the Lease was signed in the fall of 2015, only one of the entrance doors was lawfully recognized by the NYC Buildings Department ("DOB"). The second door was not legal because it was installed without proper permits. In fact, the second door did not become legal until March 6, 2017 (almost eighteen months after the Lease was signed) when certifications were filed by the Landlord's agents with the DOB.

10.   Importantly, the Landlord concealed the illegal door from the Debtor when the Lease and Commencement Date Agreement were signed in late 2015. This circumstance negates the validity of the Commencement Date Agreement.

11.   Moreover, during the ensuing months, the Debtor suffered great financial hardship since the Debtor became ineligible to obtain all of its own DOB work permits due to the existence of the illegal second door at the Premises.

12. The delays badly hurt the Debtor's cash flow and budgeting process. In the meanwhile, a number of disputes developed with the Landlord over non-payment of rent, the filing of mechanics' liens and, most recently, questions surrounding insurance coverage. This in turn led to highly contentious litigation between the parties, which has now spilled over into bankruptcy.

13. It is also noteworthy that the Landlord's obstructionism prompted the need for the filing of an earlier Chapter 11 petition by the Debtor on March 9, 2017 (Case No. 17-10570-MKU). The first Chapter 11 case arose in connection with the bonding of a mechanic's lien, and was heard by Judge Mary Kay Vyskocil, who quickly entered an Order of Dismissal two weeks later on March 24, 2017 after the Debtor confirmed a surety bond to address the outstanding mechanics' liens.

14. Following the voluntary dismissal of the first Chapter 11 case, the Debtor anticipated it would have a clear path to finish construction, only to see the Landlord strike again in issuing a fourth Notice to Cure relating to insurance on May 9, 2017.

15. This notice triggered a new round of litigation even through the Debtor provided the Landlord with evidence of liability insurance retroactive to December 9, 2016. Copies of these insurance certificates, listing the Landlord as an additional insured, are collectively annexed hereto as Exhibit "C" (collectively, the "Certificates").

16. Despite receipt of the Certificates, the Landlord refused to relent, requiring the Debtor to proceed with a Second Yellowstone Action on June 14, 2017, entitled *Artisanal 2015, LLC v. 387 Park South L.L.C.*, Index No. 653238/17.

17. As events unfolded, the Debtor encountered difficulties in the State Court and was denied a second *Yellowstone* injunction after the Court found unclean hands arising out of the Debtor's retention of several different sets of attorneys.

18. In the process, the State Court overlooked or minimized the fact that the Debtor had cured the alleged insurance default by obtaining retroactive coverage. Instead, the August 9, 2017 hearing devolved into a personal clash between Justice Kornreich and the Debtor's prior counsel, Mr. Silverbush, which did not serve the Debtor's interests well, to say the least.

19. As a matter of law, however, the Debtor's inability to obtain a second *Yellowstone* injunction only means that the Debtor, as tenant, potentially litigates the existence of the insurance default without the benefit of a safety-net, in the form of an extended cure period. Yet, with or without a *Yellowstone* injunction, the Landlord still must establish (which the Landlord cannot do) the validity of the alleged uncured defaults relating to insurance.

20. The Debtor's inability to obtain a second *Yellowstone* injunction is not altogether disabling since the Debtor was protected by the earlier *Yellowstone* injunction and TRO. Arguably, the second *Yellowstone* injunction was likely unnecessary to begin with, and therefore, the failure to obtain it certainly does did not, *per se*, trigger a termination of the Lease.

## BANKRUPTCY COURT JURISDICTION

21. The Debtor brings this adversary proceeding pursuant to Sections 105, 365, 502, 541 and 1123 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7001 of the Federal Rules of Bankruptcy Procedure to obtain a declaratory judgment pursuant to 28 U.S.C. §§2201, et seq., finding as follows:

    (i) the Lease was not terminated prior to bankruptcy, and remains property of the Debtor's estate for the purposes of bankruptcy. As such, the Lease can be assumed and assigned under 11 U.S.C. §§ 365 and 1123;

(ii) the Commencement Date under the Lease should be re-established as of March 6, 2017, which marks the date that the Premises were made fully lawful and the second entrance door was certified with DOB; and

(iii) the Debtor's obligation to pay rent begins in January 2018, and the Debtor is entitled to credits and offsets for all of the rents previously paid to the Landlord.

22. The Bankruptcy Court has constitutional authority to enter a final judgment in this adversary proceeding as a "core" proceeding within the meaning of 28 U.S.C. §157(b)(2)(A), (B), (M) and (O) in that the complaint affects the administration of the bankruptcy estate, relates to allowance or disallowance of claims against the bankruptcy estate, involves a determination of the Debtor's property rights within the meaning of §541, and implicates the future assumption and assignment of the Lease under 11 U.S.C. §§365 and 1123.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## PARTIES

24. The Debtor is a New York limited liability company located at 387 Park Avenue South, New York, NY 10016.

25. Upon information and belief, the Landlord is a New York limited liability company with offices c/o TF Cornerstone, Inc. 387 Park Avenue South, 7th Floor, New York, NY 10016.

## BACKGROUND FACTS

### A.    The Illegal Second Door

26. The Debtor and Landlord entered into the Lease on October 5, 2015, which included the diagram depicting two entrance doors to the restaurant from Park Avenue South (*See*, Exhibit "B").

27. The diagram forms a material component of the Lease and constitutes an express representation that both entrance doors were lawfully installed by the Landlord.

28. In reliance on the representation that the Premises were lawfully constructed, the Debtor executed the Commencement Date Agreement annexed hereto as Exhibit "D", which established a "Commencement Date of 10/26/16 and an Expiration Date of 9/30/31".

29. Section 1.5 of the Lease defines "Commencement Date" as "[t]he date upon which possession of the Premises is delivered to Tenant, with all of Landlord's Work [as defined in the Lease] Substantially Completed [as defined in the Lease], subject to the provisions of Section 2.7 [of the Lease], provided that Landlord shall have delivered not less than five (5) days' prior notice to Debtor informing Debtor that Landlord's Work is Substantially Completed and the Premises are available to Debtor for possession."

30. The Debtor did not learn about the illegal second door until the summer of 2016 in connection with efforts obtain permits from DOB to perform internal construction and renovation to the restaurant.

31. The DOB refused to issue all necessary permits to the Debtor until valid certifications were filed by the Landlord legalizing the second door.

32. The Landlord, however, stalled the process because it had a different agenda, and set up obstacles to freeze the Debtor out of the Premises.

33. More particularly, the Landlord was apparently in discussions with another tenant (likely Silicon Valley Bank), which expressed an interest in renting the Debtor's Premises at a higher rental rates.

34. Because of this competing interest, the Landlord retained a clear financial incentive attempt to evict the Debtor from the Premises regardless of the legitimacy of the reasons. The prospect of obtaining higher rents infected all of the Landlord's actions, and brings into play the good faith of the Landlord's overall conduct towards the Debtor.

35. This helps explain why the Landlord took an unreasonably long period of time to legalize the second door. As reflected by DOB records, the second door was not certified until March 6, 2017, more than seven months after the Debtor first became aware of the issue. Copies of the DOB filings relating to the second door filed by the Landlord's agent are attached hereto as Exhibit "E".

36. The belated legalization of the second door taints the enforceability of the Commencement Date Agreement. Given the misrepresentations in the diagram, March 6, 2017 (the date the second door was certified), should be deemed the actual Commencement Date for purposes of the Lease.

37. In turn, the Debtor should not be obligated to begin paying rent until 330 days thereafter, or January, 2018.

### B. History of Prior Notices to Cure

**(1)** **First Notice (Rent Default)**

38. The Landlord's agenda to frustrate and delay the Debtor is also exemplified by the repeated issuance of ill-motivated Notices to Cure. The first notice was issued on December 21, 2016 ("First Notice to Cure"), requiring the Debtor to cure alleged rent defaults in the total amount of $145,359.17 by January 9, 2017.

39. This notice was issued in the face of ongoing disputes over the legality of the second door and whether the Commencement Date of October 26, 2015 remained proper.

40. Because the Debtor challenged the Landlord's entitlement to rent, it commenced the first action in the New York Supreme Court, County of New York, styled *Artisanal 2015, LLC v. 387 Park South L.L.C.*, Index No. 650103/2017 (the "First *Yellowstone* Suit") seeking an

injunction to toll the cure period while the issue of the proper Commencement Date was litigated.

41. On February 8, 2017, Justice Kornreich issued an order granting the First Yellowstone Injunction on condition that, *inter alia*, the Debtor pay disputed rent into Court. As noted above, the First *Yellowstone* Injunction (*See,* <u>Exhibit</u> "A" hereto) remained in existence as of the Chapter 11 filing date on August 21, 2017.

**(2)  Second and Third Notices (Mechanic's Liens)**

42. On or about January 25, 2017, Landlord served a second Notice to Cure based on the filing of a mechanic's lien by Joseph Kleinman ("Second Notice to Cure").

43. On or about February 1, 2017, the Landlord served a third Notice to Cure based on the filing of a mechanic's lien filed by JPS Electrical Contracting Corp. against the Premises (the "Third Notice to Cure").

44. On March 9, 2017, the Debtor sought to cure by providing Landlord with a certified check from Bank of America in the amount of $104,152.08 made payable to T.F. Cornerstone. The Landlord rejected the tender and would not immediately grant an extension of time to the Debtor to substitute a Bond for a cash payment.

45. Accordingly, after waiting all day to hear back from the Landlord on an extension, the Debtor was forced to file its first Chapter 11 case late at night on March 9, 2017 to preserve its rights under the Lease.

46. Once the Chapter 11 was filed, the Landlord agreed to the extension, and the Debtor moved to dismiss the first bankruptcy case after obtaining a Bond.

47. Inexplicably, however, the Landlord filed opposition to the Debtor's motion to dismiss the Chapter 11 case for the purpose of limiting the Debtor's ability to re-file for

bankruptcy. The Bankruptcy Court, however, overruled this objection and entered the Dismissal Order without any bar to future re-filings.

48. In retrospect, that Landlord acted in bad faith by seeking to limit the Debtor's ability to re-file because it appears the Landlord was already plotting to declare another default – this time a potentially incurable default relating to the failure to renew insurance.

49. The gambit did not work, as the Debtor provided the Landlord with proof of retroactive liability insurance after receiving the fourth Notice to Cure on May 9, 2016.

### C. Scope of Retroactive Insurance Coverage

50. Given the current focus on insurance, it is important to highlight in detail the significant efforts undertaken by the Debtor to remedy the insurance default by obtaining a number of coverages as outlined below.

   (a) Commercial General Liability Insurance ("CGLI"):

   - Debtor's original CGLI and umbrella policy, was issued by Admiral Indemnity Company and insured the Premises from December 9, 2015 through December 9, 2016 (the "First CGLI Policy").

   - Debtor secured a second CGLI and umbrella policy from Admiral Indemnity Company, insuring the premises from December 9, 2016 through June 2, 2017 (the "Second CULT Policy").

   - Prior to the expiration of the Second CULT policy, Debtor secured a third CULT policy from United States Liability Insurance Company, insuring the premises from June 1, 2017 through September 1, 2017 (the "Third CGLI Policy"), as well as an umbrella policy from Scottsdale Insurance Company, insuring the premises from June I, 2017 through September 1, 2017 (the "Third Umbrella Policy").

   - In bankruptcy, the Debtor has renewed both policies as required by US Trustee guidelines.

   (b) Workers' Compensation/Employers' Liability Insurance:

   - The Debtor is not yet operating a business in the Premises. Accordingly, there are no employees requiring Workers' Compensation/Employers' Liability insurance.

- The Debtor, however, secured a Workers' Compensation/Employers' Liability insurance policy from Amtrust Insurance Company of Kansas, Inc., for the period beginning June 12, 2017 and running through June 12, 2018 (the "WCEI Policy").

(c) <u>Tenant's Property and/or Tenant's Work Insurance</u>:

- The Lease requires the Debtor to maintain property insurance in an amount equal to one hundred (100%) percent of fully replacement value (with a deductible not exceeding five thousand ($5,000) dollars) covering Tenant's Work (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises, against fire and other risks included in the standard New York form of property insurance including business interruption insurance covering a period of twelve (12) months.

- The Premises are still under construction and remain vacant. Accordingly, the Debtor has no property to insure.

- The Debtor, however, secured a vacant building policy, from United States Liability Insurance Company, for the period of June 12, 2017 through September 12, 2018 (the "TPTW Policy").

51. The breadth of this insurance coverage meets the requirements of the Lease, and nullifies the Landlord's efforts to terminate the Lease. Thus, for the purposes of the Debtor's Chapter 11 case, the Lease remains property of the Debtor within the meaning of Section 541, making it capable of subsequent assumption and assignment.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR A DECLARATORY JUDGMENT

52. The Debtor repeats and realleges the allegations set forth in paragraphs "1" through "51" above as though set forth at length herein.

53. Pursuant to the Federal Declaratory Judgment Act, the Debtor seeks a judgment declaring and finding that, *inter alia*, the Lease was not terminated prior to bankruptcy, and remains an unexpired executory contract to be administered in this Chapter 11 case through assumption, and potentially assignment, pursuant to Section 365 of the Bankruptcy Code.

54. Among other things, the notice to terminate issued on August 14, 2017 violated the First *Yellowstone* Injunction, which was still in effect at the time, and prevented the Landlord "from taking any action to terminate the Lease".

55. Even if, *arguendo*, the First *Yellowstone* Injunction did not operate to protect the Lease, the Debtor nevertheless cured the defaults relating to insurance by obtaining retroactive liability insurance coverage, effective as of December 9, 2016. The balance of the insurance requirements are not currently applicable since the restaurant has not opened, and therefore the Debtor does not have any employees or actual personal property to insure. Nevertheless, the Debtor obtained policies for these items in advance of their actual due dates.

56. The Landlord's notice to terminate improperly casts a pall over the Debtor's bankruptcy case, and is preventing the Debtor from moving forward to market the Lease to fund a Chapter 11 plan.

57. Resolution of the status of the Lease is particularly important because of the limited time frames established in Section 365(d)(4) in which the Debtor may assume the Lease in bankruptcy.

58. An actual controversy exists between the Debtor and the Landlord with regard to the continued validity and enforceability of the Lease, as well as the proper Lease Commencement Date thereunder.

59. Given the Landlord's failure to legalize the second entrance door from Park Avenue South until March 7, 2017, the Commencement Date should be re-set as of this date, with a corresponding extension of the Rent Payment Date and proper credits to the Debtor for all rents previously paid.

60. The Debtor has standing to assert claims against the Landlord under the Federal Declaratory Judgment Act because the Landlord's continued denial of the Lease materially impacts the administration of the case and the plan confirmation process.

61. The Debtor's rights to assume and assign the Lease can only be pursued following a decision from this Court that the Lease constitutes property of the Debtor's estate to be administered under Section 365 of the Bankruptcy Code.

62. It is therefore necessary that this Court declare the actual rights of the parties and make a determination as to the correct status of the Lease.

63. In view of the foregoing the Debtor seeks, and is entitled to a declaratory judgment:

  i. the Lease was not terminated prior to bankruptcy, and remains property of the Debtor's estate for the purposes of bankruptcy. As such, the Lease can be assumed and assigned under 11 U.S.C. §§ 365 and 1123;

  ii. the Commencement Date under the Lease should be re-established as of March 6, 2017, which marks the date that the Premises were made fully lawful and the second entrance door was certified with DOB; and

  iii. the Debtor's obligation to pay rent begins in January 2018, and the Debtor is entitled to credits and offsets for all of the rents previously paid to the Landlord.

WHEREFORE, Plaintiff prays for the entry of a judgment consistent with the foregoing, and awarding such other and further relief as may be just and proper.

Dated: New York, New York
September 28, 2017

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
Proposed Special Litigation Counsel for
Debtor/Plaintiff
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By:    /s/ Kevin J. Nash